HASH, J.
The plaintiff, Jonas Walraven, exhibited his bill in the court below against the defendants Lock and Abraham Isler, charging, that being the owner of a tract of land in Jefferson county, containing 305 acres, which was subject to a mortgage for about $1,500, and to a further incumbrance by a deed of trust, to secure the payment to the defendant Lock of the sum of about $430, with interest; and the land having *839 been decreed to be sold to satisfy the amount due upon *the mortgage, and the day of sale advertised, he applied to the defendant Lock to befriend him; when it was agreed between them, that Lock should attend the sale, and buy the land in for him, and allow him a reasonable time to make from the said land, and the two saw mills thereon, the amount the said Lock might advance, with interest, and also to pay him his own debt of $430 and interest, and thus redeem the land. That the said Walraven was also in the mean time to give all the aid he could in raising as much money as he could command to meet the cash paj'ment on the day of sale, and to meet the three deferred payments as they fell due, as far as he could; and if in a reasonable time after the last installment fell due, it was found that the said Walraven had not succeeded according to his expectations, then they were to sell two hundred acres of the tract, and one of the saw mills, or as much more of the property as would pay off the amount which the said Lock had advanced, and his debt of $430, with interest, secured by the deed of trust. That it was generally known in the neighborhood, and especially among the persons who attended the sale, that Lock was to buy in the land for him. Accordingly, on the day of sale, which was the 17th day of June, 1833, Lock became the purchaser for the sum of $1,551; one-fourth in cash, and the balance in twelve, eighteen and twenty-four months. That this was a price greatly below its real value, and that other persons who were present were prevented from bidding, from the fact being generally known that Lock was buying it in for the plaintiff.
The defendant Lock admits that it was agreed between himself and Walraven, that he was to buy in the land if it did not go too high, with the privilege on the part of Walraven to redeem it, but upon very different terms from those stated in the bill; which, according to Lock’s statement, were, that he was to buy the land, “and that the money which W’alraven said he could raise, and any other that he could pay, should first be ^applied to the debts which he owed the said Lock, including the open account claim, as well as the deed of trust, and then to reimburse him for the money he might have to advance for the cash payment, in a reasonable time. And, also, that he would meet the deferred payments, as they fell due, or pay largely towards them, so that he would not be burthened by the purchase; and in that event, he would allow him to have the land back when he had thus paid for it. These are the different versions of the agreement given by the plaintiff and defendant.
Let us now see how far the testimony sustains the plaintiff’s statement. In the first place, I will remark, that the credit due to the answer, as a piece of evidence, is somewhat impaired by the improbability of the statement that Walraven, who had gone to the defendant for relief to aid him to save his land from sale, should have agreed to incur obligations much more onerous and oppressive than those from which he sought to escape. For, according to the answer, he not only agreed to apply all the cash in hand, and that which he might thereafter make, in the first place to the payment of the defendant’s entire debt, as well that secured by the trust deed as that due by open account, but to meet with punctuality the deferred payments as they fell due, or pay largely towards them at the short intervals of twelve, eighteen and twenty-four months. This was an undertaking manifestly beyond his ability, and which both parties must be presumed to have known at the time. Another circumstance in the answer, which is not undeserving of notice, is, that Lock says “on the day of sale complainant paid to respondent $46 in cash, and gave him an assumpsit of B. C. Washington for $166 39.” Whereas, Washington, in his deposition, says, “Mr. Walraven asked me to pay him as much as I could of some money I owed him, that he might help Mr. Lock to pay for it, and I did assume to the complainant as much as I owed Mr. Walraven, between *one and two hundred dollars.” It is admitted by both parties, that there was an agreement between them that Lock should buy the land, and that Wal-raven might thereafter redeem it upon some terms, then agreed on between them. It is proved, that Walraven on the day of sale paid as much as $226 29 in cash, and its equivalent, which went to reduce the cash payment, and in about two weeks af-terwards, made a further payment of $55. It is also proved that he continued to hold the possession and use of the land and saw mills thereon, until the year 1836, without rent, which must have been after the last installment fell due, and although the contract for the rent was made with Lock, yet the testimony leaves it in doubt, whether the rent was for the benefit of Walraven or not. The commissioner of the revenue, Mr. Brown, proves that in the spring of 1834, Lock told him, “that he must not charge the tax to him, or rather that I must make Jonas pay it; that he had bought the land, and given Walraven the privilege of redeeming it if he was ever able.” Mr. Washington also proves, “that he had a conversation with Mr. Lock, from which the deponent derived the impression, that he had bought for Walraven’s benefit, and that Walraven was to be permitted to work the property, and to endeavor to work out the price given by Mr. Lock.”
David Howell, another witness, proves, that he had heard Lock talk several times upon the subject in his store, and while he could not state the particulars of each conversation, 1 ‘that his impression was that Mr. Lock said that he had bought the land for Mr. Walraven’s benefit, and when he paid him what he paid for it, and perhaps a debt Walraven owed him, he was to have the land.” T. C. Bradly, a fourth witness* *840 says, “he had heard Mr. Lock speak frequently of it, and say that he wanted nothing' more than what He had paid for it back again.”
. It is also proved by the evidence, that the land sold for a price greatly below its value; and that bidders *were induced to stand off, from the prevalence of the belief, that Lock was buying it in for IValraven; and that only a sum sufficient to satisfy the mortgage was bid. It is further proved, that in 1837 three hundred acres of the land and one of the saw mills were sold to Perdue for $3,000, leaving the other saw mill undisposed of. This testimony of the plaintiff is sought to be overthrown by a letter written by the plaintiff to the defendant, which I think proves but little either way; and the further fact, that Walraven, on the 27th day of August, 1835, being in custody under a capias ad satis-faciendum at the suit of another creditor, upon taking the oath of insolvency, omitted to surrender his equitable interest under his contract with Lock, but rendered a schedule in which this interest was not included. This is certainly a fact, not without some influence, on weighing the evidénce in this case; but we all know how many ignorant men there are in the country, who might not be aware of the duty to surrender such an equitable interest. I say nothing of the explanation contained in the bill of the reason why it was omitted, because he has furnished no proof to sustain it; but it was an explanation of the fact set out in the bill, and the name of the counsel given, under whose, advice it was omitted, and, if not true, it was a very easy matter to disprove it.
Prom this review of the testimony, I think it may be safely said that the plaintiff has substantially made out his case, as stated in the bill, and that it is manifestly the case of a purchaser acquiring the legal title to the land under a parol agreement, made at the time, that it was to be held as security for the payment of certain specified sums of money, which, when paid, the original owner would have the right to redeem. If this is so, it is a case that does not fall within the operation of the statute of frauds and perjuries, but is wholly free from the embarrassments which that statute is supposed to present. The right to redeem created an express trust *in favor of the person having the right to redeem, which, when the condition was .complied with, gave him the right to call .for the legal title. I take it, that the law in Virginia has been settled by various decisions that parol evidence may be received to prove an express as well as an .implied trust. In the case of an absolute deed upon its face, it has been frequently decided that parol evidence may be received to prove that the instrument was in truth .a mortgage, and this is upon the principle that it is competent to prove by parol testimony the express or agreed conditions upon which the legal title was acquired. Ross v. Norvell, 1 Wash. 19; Robertson v. Campbell, &c., 2 Call, 354; Thompson v. Davenport, 1 Wash. 125; Dabney et als. v. Green, 4 Hen. & Munf. 101; King v. Newman, 2 Munf. 40. And in the case of the Bank of the D. S. v. Carrington, 7 Leigh, 566, the question was expressly decided, by an unanimous court, that it was competent to receive parol proof of facts to establish ah implied or resulting trust, and that the statute of frauds and perjuries in Virginia did not apply to cases of implied trust; and, in delivering their opinions, three of the judges proceed to point out the difference between the English and the Virginia statutes, and very strongly intimate that the statute of frauds in Virginia has no application to either express or implied trusts. Judge Carr, in that case, says the English statute “differs from ours with respect to trusts' in this, that by their 7th section, it is enacted that all declarations or creations of trusts, &c., of any lands, &c., shall be manifested and proved by some writing, &c. . To which section there is a proviso, that where any conveyance shall be made of lands, &c., by which a trust or confidence shall or may arise or result by implication or construction of law, &c., such trust, &c., shall be of like force and effect as if this statute had not been made; whereas, by our statute, the whole subject is omitted. We have neither the enacting clause nor the proviso which that clause rendered necessary.”
*Entertaining, then, the opinion that the above cases settle the law in Virginia that express as well as implied trusts may be proved by parol testimony, and that the statute of frauds and perjuries has no application to either, I am of opinion that the decree of the court below, dismissing the appellant’s bill, ought to be reversed.
THOMPSON, J.
The counsel for the ap-pellee Lock have in argument maintained the rectitude of the decision of the court below upon two grounds. The first is founded on the statute of frauds and perjuries, the last on the merits irrespective of the statute. It is contended, if the parol agreement alleged or the case stated by the bill had been fully proved, the appellant was precluded from relief by the statute, although neither pleaded nor relied on by answer, because, as contended, it might be availed of at the hearing without having been relied on by plea or insisted on by answer. Without intending to commit myself upon this point of equity practice and pleading, which is by no means well settled either way, let it be conceded, for the sake of the argument, that the defence of the statute may be invoked at the hearing for the first time without having been claimed by plea or answer. The more important question remains to be considered, Is this a case coming within the purview of the statute? I confess, when the counsel, at the threshold of the argument, assumed that this was a bill for the specific execution of a contract for the sale and *841 purchase of land within the influence of the statute, having given the record a hasty perusal, the proposition took me somewhat by surprise. Instead of such a bill as the argument assumes it to be, it is, as it seems to me, substantially a bill of a mortgagor and mortgagee to redeem, or of a cestui que trust against a trustee to enforce the execution of the trust. If so, need I cite authority to establish that this equitable right to redeem, or this trust to be enforced, may be established *by parol, notwithstanding the statute. Case after case has been decided in our own state and in New York, sanctioned by English adjudication, establishing the proposition, that it is dompetent, notwithstanding the statute of frauds and the rule of evidence excluding parol evidence in certain cases, to prove by parol evidence that an absolute bill of sale or absolute deed for land was in fact intended to operate as a mortgage or conditional sale. A reference to and approval of these decisions will be found in the opinions of the judges in the Bank of the U. S. v. Carrington et als., 7 Leigh, 566, which is a very instructive case upon the question we are now considering; for, although the particular point there decided, and necessary to be decided, was that a resulting trust was not within the statute, the decision proceeded upon grounds and reasoning equally applicable to the case of the absolute bill of sale and absolute deed for land, and equally applicable to the parol trust sought to be enforced by this bill. The judges there advert to the difference between the English statute and our own, both in its provisions and phraseology, and show, that whilst the English statute of frauds embraces express trusts, it in express terms excludes the resulting and implied trusts from its operation, and that our statute, embracing neither, excludes both. And it is obviously to that difference between the Virginia statute and the original statute of frauds that they refer the decision of the cases, in which it was held competent by parol to convert absolute bills of sale and deeds for land into mortgages or conditional sales. These cases áre not only cited with approbation, but the grounds of the decisions more fully and better stated than in the cases themselves. This, then, is not a bill for specific execution of a contract for the sale of land, but for the enforcement of an equitable collateral contract, in virtue of which the appellee Lock became clothed with the legal title of another’s land, which contract, as we have seen, need not be in writing, but may be proved by parol, *and which contract constituted the appellee virtually mortgagee or trustee, and not absolute owner of the land. To apply the statute to such a case would be, to borrow the remark •of a learned judge on a similar occasion, to make it a statute for the encouragement of fraud, instead of one for the prevention of frauds and perjuries.
Upon the merits, it has been argued that the appellant must fail, because the agreement upon which he founds his right to redeem has been denied by the answer, and that the proof adduced in support of the appellant’s pretensions is insufficient to overthrow the negative.allegations of the answer responsive to the bill. That some agreement or contract was entered into, is not only abundantly proved by the testimony introduced by the appellant, but the answer itself, whilst it denies the contract alleged by the bill, admits a contract different from the one alleged, and sets forth its terms and provisions. Both agree in the most important particular, that Lock purchased and acquired the legal title, subject to the right of Walraven to redeem; but they differ in this: in the contract admitted by the answer, Walraven’s right to redeem, or, as it was intimated, to re-purchase, it is alleged, was conditional and limited as to time. In that alleged by Walraven the right was unconditional, unlimited by any particular period of time, but was to be exercised in a reasonable time, placing it upon the footing of every mortgage. It is argued ' for the appellee, that the contract admitted by the answer is most in accordance with the reasons and probabilities of the case; that all the testimony of the plaintiff might as well, nay, with more propriety, be referred to that than to the contract alleged, and that, in addition to this, the appellees’ pretensions are strengthened, sustained and fortified by the disclaimer upon oath of the appellant, or, what is deemed tantamount, his failure to surrender in his schedule the benefit of this contract, or equity of redemption, when he took the oath of insolvent debtor at the suit of *Isler. Now, it seems to me, that a very obvious answer to that argument is this: The bill alleges a contract for redemption. Without the answer, nay, if any contract for redemption had been positively denied by the answer, the evidence abundantly establishes some contract for redemption. Suppose the case had stopped here, what sort of a contract for redemption would the law have presumed? Most certainly, I conceive, an agreement to redeem in a reasonable time; and, if so, can the appellee get rid of this presumption, by admitting a contract and alleging affirmatively conditions and limitations to that contract without proving them? I say, unhesitatingly, no. But, so far from the intrinsic evidence arising out of the reasonableness or probability of the contracts themselves, and the testimony of the witnesses, and the acts of the parties, tending to establish the existence of the agreement admitted by the answer — in my judgment, thej all conduce to the proof of the contract alleged in the bill. The general understanding before and on the day of sale that Lock was to become the purchaser for the benefit of Walraven ; the fact that in consequence of that understanding persons were prevented from bidding and the property was knocked down at a price greatly below its value; that Wal-raven, on the day of sale, paid to the corn- *842 plainant much the larger portion of the cash payment, and continued to make payments even after the time when, according to Lock, his right to redeem or re-purchase had expired; Lock’s admissions, from first to last to the witnesses, and his answer, that he purchased subject to an agreement of redemption; the letter of Walraven, introduced in evidence by Lock himself; the continued possession of and non-payment of rent by Walraven, all go to establish a conclusion, that it is impossible to resist, that the agreement set forth in the bill is a true one. The counsel for the appellee very ingeniously endeavored to evade the force of this evidence, by referring all the acts and admissions of Lock *antecedent to 1835, (when, according to his version of the contract, the right to redeem was terminated,) to the contract admitted in the answer, and all such acts and admissions of a subsequent date, to a benevolent intention or purpose on his part to confer on Walraven a gratuity; but without proof of this contract, affirmatively alleged in the answer, its existence cannot be assumed even for the purpose of weakening the conclusive tendency and effect of the plaintiff’s evidence to establish the agreement alleged in the bill.
Being of opinion, then, that the plaintiff’s case is clearly made out by the testimony, as well as sustained in a very material point by the admissions of the answer, X deem the fact of the appellant’s having taken the oath of insolvent debtor, without surrendering this interest, a very immaterial, if not trivial, piece of evidence. It could only be important in a case where the pleadings and the evidence left it in doubt, whether or not such a contract as alleged had in fact been entered into, and in such a case as that, might be sufficient to turn the scale; but where the case is clear upon the evidence, it becomes wholly immaterial. Whether or not the appellant omitted to surrender, for the reasons assigned in his bill, or for the purpose of perpetrating a fraud on his creditors, wilfully perjured himself, is a very immaterial inquiry in this case. Charity should prompt us to yield a very ready and willing credence to the apology assigned for fhe omission ; but if not, and we must conclude him guilty of perjury, he thereby only exposed himself to the pains and penalties of perjury, and forfeited no right of property. So far from it, the law transferred the interest to the sheriff, for the benefit of the ca. sa. creditor, reserving to the debtor his equity of redemption, which, in this case, was an equity of redemption in an equity of redemption.
In conclusion, I will observe that this is an incomparably clearer case in favor of the right to redeem, than the case of Roberts’ administrator v. Kelly, decided *by this court during the present term. In that case, upon the circumstantial evidence alone, not very unlike, though more conclusive than the same sort of evidence introduced in this case, against the positive and flat denial ■ of the answer, and without a single positive witness to contradict the answer, we affirmed the right to redeem. In this, a right of redemption is proved by six or seven witnesses, deposing as to the declarations and admissions of the appellee, and moreover admitted in the answer, but coupled with an affirmative allegation of a right to redeem upon- certain conditions and limitations, unsustained by any proof or by the circumstances and probabilities of the case; and there is this singular coincidence in the two cases, that in both, the defendants in the court below endeavored to escape from the force and effect of the pregnant fact of the payment of a part of the purchase-money, on the day of sale, by the debtor, whose property had been sold, by the allegation and pretence that it was paid by the debtor, in discharge of other indebtedness, or upon other accounts, existing between the debtor and purchaser. If we were right in reversing the decree of the court below in that case, and affirming the right of Roberts to redeem, as I think we were, I cannot doubt about the propriety of doing likewise in this.
FIELD, P., and CLOPTON, J., verbally concurred with THOMPSON, J.
TYLER, j., dissented.
The decree was as follows:
The court is of opinion, that the decree of the circuit court is erroneous. Instead of dismissing the bill of the appellant, that court should have sustained his claim to the relief prayed by the bill, and preparatory to a decree for redemption, or of foreclosure and sale, as the result of a settlement of the accounts between the ^parties should render the one or the other of said decrees proper, should have entered an interlocutory order of account, to ascertain the balance due the appellant or the appellee Lock, as the case may be, after debiting him with the purchase-money of the 300 acres of land, sold to Perdue, with its interest, and the rents and profits received by him on account of the same, and crediting him with all moneys advanced bj’ him for the purchase of the land under the decree of the court, over and above the amounts paid by the appellant, with, interest, with the debt of $431 80, secured by trust deed on the land, and with any other just debt or demand which the appellee Lock could establish before the commissioner he was justly entitled to.
It is, therefore, decreed and ordered, that the decree aforesaid be reversed and annulled, and that the appellee, W. E. Lock, do pay unto the appellant his costs by him expended in the prosecution of his appeal aforesaid here, and the cause is remanded to the Circuit Court of Jefferson county, for further proceedings to be had therein, in conformity with the foregoing decree, with instructions to enter up the interlocutory order of account hereinbefore indi *843 cated, and, upon the coming' in and confirmation of the commissioner’s report, to render a decree for redemption, or of foreclosure and sale, as the result of the account may require, taking care first to subject so much of the appellant’s equity of redemption in the unsold mill and five acres of land, and in the purchase-money of that which was sold to Perdue, (provided the equity of redemption should prove valuable after accounting for and satisfying all the just claims of the appellee,) as shall be sufficient to pay and satisfy the debt, interest and costs of Isler and wife, for which appellant was taken in execution upon a writ of ca. sa., and upon which he took the oath of insolvency; and upon satisfaction of the claims of the appellee and the debt of Isler and wife, should the mill and five acres remain to the appellant, the court will decree a re-conveyance *from the appellee, and release by the heir-at-law of the sheriff, in whom the appellant’s equity of redemption vested upon his taking the oath of insolvency ; and upon the final decree in the circuit court, it will decree costs in favor of the appellant up to the time of entering in that court the order of account, directed by this decree, and all costs subsequently accruing in taking the account, or in the subsequent progress of the cause, it will decree in favor of the appellee.